UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                    **MEMORANDUM AND ORDER**

             - against -                              13-CR-216 (RRM)


MARTESE PRICE,

                          Defendant.
-------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

        On or about April 3, 2013, a grand jury in this district returned an indictment charging

Martese Price with being a felon in possession of a firearm.  The charge arose from a street stop

on the night of February 27, 2013, when police discovered a gun in defendant's pants pocket.

        Price moved to suppress the gun, arguing that the police lacked reasonable suspicion to

stop and frisk him.  The government opposed the motion, arguing that the search and seizure

were lawful.  The Court held an evidentiary hearing at which the government presented

testimony from New York Police Department ("NYPD") Officers Konrad Zakiewicz and Javier

Velez.  The defense presented testimony from investigator Phillip Martin.

        Defendant's motion is granted.  As discussed in detail below, the Court does not credit

the testimony of Officers Zakiewicz and Velez, and suppression is warranted.


                                    **BACKGROUND**

    **A.  The Government's Evidence**

        According to the Government's witnesses, if believed, three officers – Zakiewicz, Velez,

and Salwa Jwayyed – and their supervisor, Lieutenant Danielle Raia, were on routine patrol near

the intersection of Bristol Street and Newport Avenue in the Brownsville section of Brooklyn at

11:45 on the evening of February 27, 2013.   They were assigned to the Brooklyn North

Borough Crime Unit responsible for preventing violent street level felonies.  Officer Zakiewicz

joined the NYPD in 2007, and served in a variety of commands in which he made 290 arrests

and participated in thousands more. (Suppression Hearing Transcript ("Tr.") 28-29.) Officer

Velez is a nine-year veteran of similar experience, having made approximately 150 arrests and

participated in hundreds more.  (Tr. 92.)  On the night of February 27, the team was in an

unmarked car, with Velez driving, Raia in the front passenger seat, Zakiewicz in the rear behind

Velez, and Jwayyed behind Raia.  (Tr. 31.) All were wearing plainclothes, and Zakiewicz had

body armor under his outer garments.  (Tr. 32.)

According to both Zakiewicz and Velez, despite the cold weather, each had his window

rolled down, a regular practice of each officer in order to better hear and see.  Both Zakiewicz

and Velez generally explained that the vicinity was a high-crime area, and testified that they had

"heard" of a shooting in the area, perhaps a block or two away from the scene of the incident

here, perhaps one or two days prior, that may have resulted in a fatality.  (Tr. 30:10.)  Zakiewicz

added that "he was on the lookout for people retaliating on individuals" and that "he did not

know if [the shooting] was an ongoing gang turf war or people might have ongoing problems and

might be walking around in that particular area."[1]  (Tr. 30:11–15.)

While driving slowly on Bristol Street toward the intersection of Newport Avenue,

Zakiewicz observed from ten feet away a man he later identified as Martese Price.  Price was

walking on the left side of the street in the same direction as the officers were traveling, wearing

a gray hooded sweatshirt, and "track, workout pants with white stripes going down the side of his

---

[1] On this, the testimony of the officers is quite vague and inconsistent in some particulars.  Neither indicated his basis of knowledge regarding a shooting, nor did they provide any level of detail regarding its circumstances.  Neither was sure or consistent as to when the incident occurred, where the incident occurred, whether it was gang-related, or whether anyone was killed.  Velez mentioned nothing about patrolling for individuals seeking to retaliate.

leg to his ankle." (Tr. 33:2–3.) According to Zakiewicz, "he looked very nervous, apprehensive, walking, looking back over his shoulder all the time."[2] (Tr. 33:12–13.)

Zakiewicz claimed that he "noticed that in [Price's] right side pants pocket had some sort of a heavy object and . . . that side of his pants was sagging also." (Tr. 33:20–22.) When asked to describe what the object looked like, Zakiewicz testified: "It definitely looked heavy. It wasn't any rectangular or squarish form to make me think that it was a cell phone or a wallet. I could see it was very heavy and I suspected at that point that it might be a weapon." (*Id.*) Zakiewicz also testified that he observed that Price "had some sort of electronic device in his left hand." (Tr. 34:20–21.)

According to Zakiewicz, as Price continued walking down the block with the officers still following him, Zakiewicz observed Price "[n]umerous times . . . touching that heavy object in the right pants pocket."[3] (Tr. 35:1–2.) Zakiewicz demonstrated this action for the Court, placing his right hand with palm open and fingers outstretched on his own right front pocket, his arm hanging down to his right side, elbow and forearm straight, as he walked while glancing repeatedly over his right shoulder. Next, Zakiewicz claimed, Price "made eye contact and he slowed his pace a little bit, and then he picked up his pace even faster than he was initially walking." (Tr. 35:23–25.)

Zakiewicz acknowledged that he did not know if the object in Price's pocket was a weapon. Zakiewicz testified generally that there was sufficient street lighting for him to see what he says he saw.

---

[2] As discussed more fully below, Zakiewicz's testimony at the hearing on this point was different than that given to the federal grand jury.

[3] Again as discussed below, Zakiewicz's testimony at the hearing on this point was different than that given to the federal grand jury.

At this point, according to Zakiewicz, he "asked to be let out of the vehicle," and, as Zakiewicz described it, Velez pulled the car parallel to the curb and stopped to allow him to exit.[4] (Tr. 33:6). Zakiewicz then testified that he approached Price, and "identified myself as a police officer and asked the individual if he had any weapons." (Tr. 36:17–18.) Zakiewicz testified that he didn't ask Price to stop or "obstruct him and walk him towards my direction in any way because he was walking in the opposite direction" (Tr. 76:5–7), and that he never had his hand on his gun or holster. Zakiewicz testified that Price stopped and faced the officer, and with Zakiewicz "face to face" with Price approximately two feet away (Tr. 37:17), Price responded, "Oh, shit" (Tr. 36:22).

Zakiewicz then testified that he "touched the right pocket and [ ] felt a gun . . . because that's the pocket that he kept on touching, that is the pocket that contained the heavy object."[5] (Tr. 38:20–21.) Zakiewicz testified he felt a gun. Zakiewicz then

> grabbed [Price] in a sort of bear hug underneath his arms and put him against the fence . . . to restrict his arm movement so I wouldn't engage in a struggle recovering the item from his pocket at the same time he might have been reaching for it. I didn't know if the gun was loaded. Maybe the trigger could have been cocked and if we both went for it at the same time, it could have resulted in an accidental misfiring, accidental shooting.

(Tr. 40:11–20.) A loaded .380 caliber Bryco semi-automatic pistol was recovered from Price's right pants pocket.[6]

---

[4] As discussed below, Velez recounts this differently.

[5] When asked if there was anything in his training and experience that led him to think that Price had a gun in his pocket, Zakiewicz pointed to his numerous hours of training in the academy and on the range, and his experience in a unit that deals with guns, adding that he was "familiar with various types of guns that are out on the street." (Tr. 40:2–3.)

[6] It is not entirely clear from the testimony of either officer who actually removed the gun from Price's pocket.

Zakiewicz said nothing in his testimony about Officer Jwayyed's presence during his encounter with Price, or her assistance – or that of any of his fellow officers – in the approach, arrest and disarming of Price.

For his part, Officer Velez provided a bit of relevant and admissible testimony – some aspects add to the narrative, while others raise serious issues of credibility and generate more questions than answers about the government's proof as a whole.  Velez was driving the unmarked car that evening, and pulled the car closer to the left side of Bristol Street after he observed Price walking toward the intersection of Newport Avenue.  At some point while trailing Price at a slow speed, Velez heard both back doors of the vehicle open, causing Velez to "hit the brake."  (Tr. 99:5.)  Velez testified that he did not hear Zakiewicz ask to leave the car or say anything else.[7]

Velez then testified:  I knew that my partners had jumped out, so in case the individual was to try to run, to take off running, it's a tactics move.  I pull[ed] up ahead and I cut towards the left so if the individual would take off running . . . I would be able to cut him off, he would run right into me."  (Tr. 99:15–20.)  Velez then stepped out of the vehicle and stepped on to the curb, where he saw Zakiewicz and Jwayyed "restraining the individual."  (Tr. 99:25–100:1.) Velez then "ran over to them and I helped them cuff [Price], handcuff him."  (Tr. 100:3–4.) Although he stated that he "eventually s[aw] a gun," Velez claimed that he did not see any aspect of the encounter between the other officers and Price.  (Tr. 100:24–25.)

Velez also testified to his own observations of and suspicions about Price, including observations of a heavy object in Price's sagging pocket, and similar movements and hand gestures as Price walked on Bristol Street, which he, too, demonstrated.  However, Velez never

---

[7] The government stipulated that if the case agent were called to testify, the agent would testify that Velez stated he pulled the car over after hearing someone say, "Let me out."  When confronted with this prior statement at the hearing, Velez denied ever making it.  (Tr. 192:25–193:13.)

communicated his observations to Zakiewicz or to any of the other officers at any time prior to Price's arrest. Nor did Velez participate in the initial encounter with or search of Price; in fact, he claims not to have seen these events. Thus, Velez's testimony in this regard is of limited value. That Velez may have made observations consistent with those of Zakiewicz does not mean that Zakiewicz actually saw what Zakiewicz claims he saw, nor do Velez's observations persuade the Court that Zakiewicz is telling the truth as to Zakiewicz's own observations. Thus, to use Velez's testimony in this manner would constitute improper bolstering. Moreover, as discussed herein, Velez is a witness of doubtful credibility.

## B. Prior Adverse Credibility Findings Involving Zakiewicz and Velez

Before assessing the weight and credibility of the government's proffered testimony as required of the Court in its role as fact finder, and measuring the credible evidence against the applicable legal standard, the Court turns to another critical aspect of the record evidence in this case: evidence concerning the officers' reputations for truthfulness, including prior adverse credibility findings against both Officer Zakiewicz and Officer Velez. In advance of the hearing, the government made extensive *Giglio* disclosures regarding both officers (*see* Doc. Nos. 18–19, 28). *See Giglio v. United States*, 405 U.S. 150 (1972). It moved *in limine* under Rules 608 and 403 of the Federal Rules of Evidence to preclude cross-examination regarding 1) adverse credibility findings by other judges of this court and the Civilian Complaint Review Board ("CCRB"), and 2) allegations of misconduct (implicating, for example, false arrest and/or the use excessive force) raised in civil lawsuits or in complaints with the CCRB by the aggrieved parties. *See United States v. Cedeno*, 644 F.3d 79, 83 (2d Cir.), *cert. denied*, 132 S. Ct. 225 (2011) (setting forth factors to consider in determining the probity and relevance of a prior incident in which a court has criticized the credibility of a witness's testimony). Defendant opposed the

motion, and after full briefing and oral argument, the Court allowed inquiry related to three areas, one as to Officer Zakiewicz, and the others related to Officer Velez. [8] They are described below.

### 1. Zakiewicz

On facts markedly similar to those at bar, Judge John Gleeson refused to credit the observations of Officer Zakiewicz and his partner – ironically, the very same Officer Jwayyed – in connection with a different late-night stop and frisk of an individual ultimately found in possession of a gun concealed in his waistband. *United States v. Ronald Mayo*, No. 13-CR-251, 2013 WL 4147981 (E.D.N.Y. Aug. 15, 2013). In discussing the many factors undermining the officers' testimony, Judge Gleeson concluded: "Zakiewicz's testimony on its face describes implausible, though not impossible, circumstances," including Zakiewicz's claim (as well as that of Jwayyed) that he (and she) actually saw a gun in the suspect's waistband prior to stopping the suspect. *Id*. at *3. One aspect critical to Judge Gleeson's analysis was the fact that while Zakiewicz and Jwayyed claimed to have actually seen the weapon in the suspect's waistband before exiting their vehicle, neither said anything to the other or to their supervisor, and approached what they knew to be an armed suspect without any discussion, warning or particular precaution. In concluding that their silence undermined the credibility of their own observations, Judge Gleeson pointedly noted that the officers were "afflicted by an inexplicable silence in the

---

[8] The government's *Giglio* disclosure as to Officer Velez was considerably more bountiful. The Court precluded inquiry into 1) an unsubstantiated Internal Affairs Bureau (IAB) and Brooklyn District Attorney's Office investigation related to alleged false statements by Velez regarding the recovery of a gun in a woman's purse, and 2) three civil rights lawsuits, for false arrest, two of which had been settled . *See Gonzalez v. Velez*, No. 09-CV-685 (RJD) (E.D.N.Y. Feb. 5, 2010); *Outlaw v. Velez*, No. 08-CV-1324 (KAM) (E.D.N.Y. Jan. 5, 2009). A third lawsuit was pending at the time of the hearing, and since, has resulted in a $560,000 jury verdict against Officer Velez and two other officers for falsely arresting a man for gun possession. *See Davis v. Velez et al.*, No. 12-CV-1219 (JBW) (E.D.N.Y. Dec. 17, 2013). The man had previously been acquitted of criminal charges related to the gun possession. *See United States v. Davis*, No. 09-CR-829 (CBA) (E.D.N.Y. Dec. 17, 2010). These matters play no role in the Court's findings.

face of an alleged fact that everyone in law enforcement knows is something responsible officers don't keep secret." *Id*. at *5.

As discussed more fully below, Zakiewicz's testimony before me, *on its face*, suffers from many of the same infirmities, including similar implausible observations, as well as the same inexplicable silence in the face of the same risk. Thus, even without resort to the credibility findings of my judicial brother, the Court finds implausible Zakiewicz's testimony in this case. That conclusion is all the more compelling after ascribing significant weight, as this Court does, to the fact that Zakiewicz, on at least one prior occasion, has been found untruthful in his attempts to justify a strikingly similar stop and frisk under strikingly similar circumstances. *See United States v. White*, 692 F.3d 235, 239 (2d Cir. 2012) ("Evidence that might lead a [fact finder] to conclude that the officer was willing to lie in a similar case in order to secure a criminal conviction is both relevant and probative. This is particularly so [where the] defense centered on proving that the same detective and other officers lied about finding a weapon on [the defendant's] person.").

**2. Velez**

As with that of his partner, Zakiewicz, the testimony of Officer Velez, on its face, leaves serious doubts as to its plausibility. That will be discussed later. With regard to prior matters relating to Officer Velez's character for truthfulness, the Court permitted inquiry into two areas.

First, in discussing Officer Velez's testimony regarding another stop and frisk – also involving Officer Zakiewicz and Lieutenant Raia – Judge Raymond J. Dearie found "disturbing" Officer Velez's repeated failures of recollection with regard to key facts involving the stop of the defendant, as well as the circumstances surrounding a prior substantiated finding of excessive

force by the CCRB against Officer Velez that discredited Velez's testimony.[9] Judge Dearie

plainly expressed his concern regarding Velez's inability to recall the particulars of the stop and

frisk at issue, particularly given Velez's role in it:

> I grant you they make a lot of arrests, they make a lot of stops, perhaps some they shouldn't be making. But when you have a court case and you've testified before the grand jury, and there is an arrest report whether you've written it or not it puzzles me why there is too often these failures of recollection and it's distressing.

*United States v. Anthony Cox*, No. 05-CR-627(RJD) (Tr. of Hr'g April 24, 2013 (Doc. No. 19-1)

at 184).

Though he did not make a specific credibility finding against Velez, tellingly, Judge

Dearie disregarded Velez's testimony, ultimately ruling in favor of the government by relying

solely – and ironically – on the testimony of Officer Zakiewicz, and finding it to be credible.[10]

Taken as a whole – including the judicial proceeding in which it was given and the self-serving

nature of Velez's lack of recollection, particularly on matters that would damage both his

credibility and the successful outcome of the case at hand – the reputation evidence stemming

from the testimony before Judge Dearie bears on Velez's character for truthfulness.

Second, both this Court and Judge Dearie permitted inquiry into a substantiated CCRB

complaint against Velez for using physical force against an individual during a traffic stop. In

reaching its conclusion, the CCRB credited the testimony of the complainant and three

supporting witnesses in contrast to what the agency – charitably – termed the "weak" testimony

of Officer Velez. The CCRB found that the complainant and other witnesses were largely

---

[9] Though Judge Dearie's case involved a violation of supervised release, the facts and circumstances regarding the recovery of a gun during a stop and frisk, and the credibility of the officers involved, were central to the issue at hand.

[10] In their motion *in limine*, the government argued that Judge Dearie's finding in favor of Zakiewicz should negate the impact of Judge Gleeson's finding in the *Mayo* case. The Court rejected that argument, finding, as noted above, that even one adverse credibility finding of the nature and seriousness of that in *Mayo* warrants due consideration in the credibility calculus here.

consistent in their recitation of the events, with one providing a license plate that virtually matched that of the officers' vehicle. In contrast, Officer Velez could not recall the particulars of an event of significant moment to his own career, only five months after it occurred, and had no memo book entries reflecting the incident.[11] Thus, the CCRB's finding regarding Velez's testimony is properly considered in evaluating Velez's character for truthfulness.

Against this backdrop, the Court now turns to the applicable legal standard, an evaluation of the evidence, and its conclusions on the motion.

## DISCUSSION

### A. The Legal Standard

It is well settled that the Fourth Amendment's prohibition on unreasonable searches and seizures extends to "'brief investigatory stops of persons or vehicles that fall short of traditional arrest.'" *United States v. Doughty*, No. 08 CR 375, 2008 WL 4308123, at *2 (S.D.N.Y. Sept. 19, 2008) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). However, a police officer may briefly detain an individual for questioning if the officer has a reasonable suspicion, due to observing some objective manifestation that an individual is, or is about to be, involved in a crime. *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008); *see Terry v. Ohio*, 392 U.S. 1, 30 (1968) (stating that officer must have reasonably concluded that criminal activity "may be afoot"). "Reasonable suspicion requires 'some minimal level of objective justification' for suspecting criminal activity." *United States v. Bristol*, 819 F. Supp. 2d 135, 141 (E.D.N.Y. 2011) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). During such an investigatory stop, the officer may also conduct a frisk, or pat-down search, for concealed weapons if he has a

---

[11]  And at the hearing before Judge Dearie, Velez repeatedly answered that he could not recall, even as to the most basic of facts regarding this incident. As discussed below, Velez's memory of the incident did not improve in his testimony in this case. Indeed, he claimed not to have discussed the matter with the prosecutors in preparation for his testimony here.

reasonable suspicion that the detained individual is armed and dangerous. *Terry*, 392 U.S. at 30; *Bristol*, 819 F. Supp. 2d at 141. The purpose of this limited search is not to discover evidence of a crime, but to allow the officer to investigate without fearing violence. *Padilla*, 548 F.3d at 187.

Approaching and questioning a suspect does not necessarily amount to detaining him under *Terry*. *See United States v. McPhatter*, No. 03 CR 911, 2004 WL 350439, at *2 (E.D.N.Y. Feb. 24, 2004) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) ("As long as the person to whom questions are put [by law enforcement] remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.")). Determining at what point a police encounter with a suspect ripens into an investigative detention or seizure involves "'taking into account all of the circumstances surrounding the encounter,' and asking whether the 'police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Doughty*, 2008 WL 4308123, at *3 (quoting *Kaupp v. Texas*, 538 U.S. 626, 629 (2003)); *see United States v. Hiruko*, 320 F. Supp. 2d 26, 30 (E.D.N.Y. 2004) ("A seizure occurs where a reasonable person would not feel 'free to decline the officers' requests or otherwise terminate the encounter.'") (quoting *Florida v. Bostick*, 501 U.S. 429, 439 (1991)). The Second Circuit has identified several factors that might suggest a seizure, including the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room. *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992).

Similarly, a court must consider the totality of the circumstances to determine whether the police had reasonable suspicion to stop and frisk a suspect, *Padilla*, 548 F.3d at 187, and should make "commonsense judgments and inferences about human behavior," *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). A "series of acts, each of them perhaps innocent in itself," can, "taken together[,] warrant[ ] further investigation." *Terry*, 392 U.S. at 22; *see United States v. Lee*, 916 F.2d 814, 820 (2d Cir. 1990) ("[T]he proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing."). This assessment "does not deal with hard certainties, but with possibilities . . . the evidence . . . must be seen and weighed . . . as understood by those versed in the field of law enforcement." *United States v. Williams*, No. 13 CR 226, 2013 WL 4477027, at *2 (S.D.N.Y. Aug. 14, 2013) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). An officer's reliance on a "mere hunch," however, is insufficient to justify a stop. *Id.* (internal quotation marks omitted).

### B. The Officers' Testimony Is Implausible

The parties do not dispute the contours of this legal standard, nor do they quarrel with the fact that the encounter with the officers constituted a *Terry* stop. The crux of this motion centers on whether the officers – in particular Zakiewicz – had objectively reasonable suspicion to support the stop and frisk of Martese Price.

Mindful that the burden rests entirely on the government by a preponderance of the evidence, *see, e.g., United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (collecting cases), the Court finds that the government's evidence falls well short of this standard. Simply put, the Court declines to credit the government's testimony, and specifically finds implausible what the officers claim they saw on the night of February 27. There are many

reasons to disbelieve the officers, and they are discussed in detail below: 1) the government's failure to provide meaningful evidence in support of the officer's ability to observe; 2) the transparent falsity inherent in the observations themselves; 3) the officer's silence in the face of their suspicions; and 4) classic impeachment, as well as the officers' reputations for untruthfulness. Whether alone or in combination, all soundly support the Court's conclusions.

### 1. The Officers' Ability to Observe

The government failed to present meaningful credible evidence to support the officers' ability to see what they claimed they saw. This issue directly affects the credibility of each observation and permeates the Court's entire analysis, particularly with respect to Zakiewciz's observations, as they are the primary bases on which the government relies.

Zakiewicz first observed Price at approximately 11:45 P.M. on a winter's night from a car traveling down the middle of a one way street in the same direction as Price. As the photos and testimony showed, cars were parked on both sides of Bristol Street, and trees, grass, and street lamps lined the right curb edge of the sidewalk on which Price was walking. Thus, despite being on the side of the police vehicle nearest to where Price was walking and having his window rolled down, Zakiewicz necessarily could not have had an unobstructed view of Price's movements down the sidewalk as the parked cars and other fixed objects would have obscured Price's journey – particularly the lower half of Price's body, including the sagging pocket allegedly containing the heavy object. Moreover, Zakiewicz's estimate that he was watching Price from only ten feet away seems to underestimate the actual distance from which he observed Price. This is but one instance in a pattern of favorable embellishments that will be seen throughout Zakiewicz's testimony.

Lighting conditions are critical to assessing an officer's ability to observe, and there was much ado at the hearing about the lighting conditions on the night of February 27. Yet, the government never clearly established what those lighting conditions actually were, except through Zakiewicz's conclusory statement that there was sufficient light to see what he claimed he saw. For example, Zakiewicz was never asked specifically what the lighting conditions were on the night of his encounter with Price. Rather, he merely identifies two photos in Government Exhibit 3 of the purported area on Bristol Street where he first saw Price, and notes that the photo depicts a street light and another lighting fixture on a nearby building.

Moreover, the testimony presented never painted a clear picture of where particular events occurred, or how the events moved as Price and the officers traveled down Bristol Street toward Newport Avenue. For instance, while the photos in Government Exhibit 3 depict the scene of the initial encounter, the officers never articulate where within the block the area can be found, and instead, pointed to Bristol Street on an aerial photo of the entire neighborhood and identified, generally, the particular block on Bristol Street on which the events occurred.

More important, there is no testimony in the record as to how long Zakiewicz observed Price walking before he first made his "sagging pocket observation," whether Zakiewicz continued to observe Price after his suspicions were aroused and if so, for how long, or how far Price and the officers traveled before Price was ultimately stopped and the gun recovered. [12] Nor is there any evidence regarding the temporal proximity of any of these events to one another, or the speed with which they unfolded. Overall, the government's failure to particularize these

---

[12] Because the government never provided clear evidence of where Price was first observed or the place where Price was ultimately stopped and seized, the testimony of defense investigator Martin Philips, which focused on areas of Bristol Street both north and south of Newport Avenue and on Newport Avenue itself, was of little value, particularly when coupled with the poor quality of Mr. Phillips' photos and his own confusion as to the areas depicted in his photographs.

core aspects of the scene undermines its proof as a whole as it is exceedingly difficult to assess Zakiewicz's ability to see what he claims he saw given that key facts are so poorly established.

### 2. The Observations Themselves Are Transparently False

Critically, the Court finds the officers' observations, particularly those of Officer Zakiewicz, inherently and transparently false. As he testified, Zakiewicz observed in Price's right pants pocket, which was sagging, a "heavy object" (Tr. 33:21), that "wasn't any rectangular or squarish form to make me think that it was a cell phone or a wallet . . . and I suspected at that point that it might be a weapon." (Tr. 34:11–14).

For a number of reasons, this central observation strains credulity. First, it is hard to believe that Zakiewicz could make out the shapes he describes from a distance, while seated in a car, at close to midnight, even under the best of nighttime circumstances. And curiously, Zakiewicz does not provide any testimony suggesting that he got a closer look of the pocket or its contents either while approaching Price, or at the point where the two men found themselves face to face, within two feet of one another, as Zakiewicz maintained. Most important, the truth of Zakiewciz's claims is belied both by the clothing Price was wearing, and the shape of the gun itself. The Court turns to these issues.

### a. Price's Clothing

Price's pants – critical to this motion – were not vouchered by the police. Instead, the government introduced a post-arrest photo of Martese Price. (Gov. Ex. 3.) It depicts Price wearing the black athletic pants with white stripes from which the gun was seized, and a light-colored zippered, hooded sweatshirt that appears to fall below defendant's hips. Helpfully, the photo was taken in profile and reveals the right side of Price's body, the same side visible to

Officer Zakiewicz. Unfortunately for the government, the photo speaks a thousand words and wholly undermines the credibility of Zakiewicz's observations.

Critically, no pocket is visible in the photo. It is either obscured by the sweatshirt, or by Price's right arm, which is hanging down at his side, precisely the same way Price held it as he walked and touched his pocket on the night of February 27 as Zakiewicz described and demonstrated. And if the pocket is actually depicted in the photo, the Court is hard-pressed to see it, even under the bright lights of a police precinct booking room. Zakiewicz's powers of observation, once again, seem to be better, pointing generally in the photograph to the area just beneath Price's sweatshirt to identify where he saw the heavy object. (Tr. at 48.)

Moreover, as is the current style, both the sweatshirt and pants appear to be oversized, particularly given Price's lanky frame. Specifically, the pants are dark black, appear large and baggy, and drape quite loosely through Price's hips and legs, with several inches of material pooling at his ankles. Given the loose fit of Price's pants, it is simply hard to believe that any observer, even a trained police officer, could make out the shape of any particular object in one of the pockets, let alone determine that the object was of such non-rectangular and non-square shape as to rule out a cell phone or wallet, even while Price was walking.[13]

### b. The Shape of the Gun

There is another critical aspect of Zakiewicz's story that defies belief: the gun recovered is, ironically, quite rectangular in shape. Given Zakiewicz's express testimony to the contrary,

---

[13] In another attempt to shore up Zakiewicz's testimony, the government moved *in limine* to conduct a demonstration in which Zakiewicz would don a pair of athletic pants similar to those worn by Price, place the gun in the right pocket, and walk across the courtroom in same manner as he saw Price walk on the night of the encounter. Defendant objected, and the Court denied the government's motion. In ruling on the record, the Court noted that Zakiewicz appeared to be "significantly burlier than the very lanky and thin defendant Price," the demonstration would likely not be able to "replicate . . . where on Mr. Price's waist, hips or otherwise those pants were sitting on the night of the arrest," and that "Zakiewicz either doesn't recall or didn't know the brand of pants" or the weight of the fabric for the Court to accurately "gauge how the pants were hanging, draping on the night of the arrest." (Tr. 51-53.) Given these variables, the Court concluded that the proposed demonstration would not aid its fact-finding role.

this was particularly powerful evidence. The Bryco .380 semiautomatic is small and exceedingly compact and thin. Virtually palm-sized, its barrel is only slightly longer than its grip. The barrel is completely straight, and the grip only marginally angled. These characteristics give the gun an overall appearance of being rectangular, even without being obscured within a pants pocket. From the Court's own observations, the gun easily resembles the rectangular shape of a common iPhone, Android or other similar smart phone, and is only slightly thicker. Put another way, because of its compact size, this particular gun does not present the classic "L-shape" typical of larger guns. *Cf. United States v. Rios*, No. 09 CR 369, 2009 WL 2602202, at *2 (E.D.N.Y. Aug. 24, 2009) (defendant's descent from bicycle caused his jeans to "tighten[] up," and officer "observed the L-shape outline of a gun" in defendant's pocket); *United States v. Monroe*, No. 08 CR 609, 2009 WL 3614521, at *4 (E.D.N.Y. Nov. 2, 2009) (defendant turned his body in a way that revealed an L-shaped bulge in his back pocket); *United States v. Grant*, No. 07 CR 729, 2008 WL 897905, at *5 (E.D.N.Y. Mar. 31, 2008) ("The bulge here was not just an undefined heavy object; the distinct shape of a handgun could be made out beneath the defendant's T-shirt and shorts.").

Of course, under the late-night circumstances presented here, Zakiewicz would be hard pressed to suggest that he could actually see the outline of a gun. And to his credit, he does not. But Zakiewicz's attempts to articulate his suspicions by distinguishing the shape of a cell phone or wallet – rectangular or square – from the shape of a gun are belied entirely by the appearance of the gun itself.

### c. Efforts to Bolster the Observations

Conveniently, Zakiewicz tries to bolster his suspicions by suggesting that he could somehow see that Price was carrying in his left hand some type of electronic device, and that

Price used his right hand to touch his pants pocket to stabilize the heavy object. In this way, Zakiewicz ostensibly attempts to confirm his own suspicion that the heavy object could not have been a cell phone and may have been a gun. (Why it could not have been a wallet is less clear.) Tellingly, though, there is no evidence in the record other than Zakiewicz's self-serving attempt at corroboration to suggest that the officers recovered from Price any electronic device(s), or anything else for that matter other than the gun at issue. Also important, while Zakiewicz claims the lighting conditions and his powers of observation were sufficient to allow him to make out the shape of an object obscured in the pocket of loosely-fitting athletic pants, Zakiewicz could not identify or otherwise particularize the object in open view in Price's left hand.

Moreover, there is nothing unusual about an individual carrying an object or objects that, individually or collectively, make a pocket sag: keys, multiple electronic devices, loose change, a money clip, cigarettes and a lighter, an inhaler. Many people these days, this Court included, carry more than one electronic device. Nor is it surprising that a steadying hand may be required to keep a heavy pocket still while walking.[14] Indeed, from the Court's examination, the gun recovered from Price was heavy enough, without its magazine, to cause the pocket in a pair of loose-fitting pants to sag. But the manner in which Zakiewicz, and Velez too, presented their testimony on these points – with narrow recall and exaggerated emphasis on material facts – smacked of two very experienced officers well aware of the legal standard for which they were aiming. This was particularly acute when demonstrating the manner in which both officers claimed Price nervously walked on Bristol Street.

---

[14] Velez's testimony that he often has to steady his own weapon is inapposite, as he carries his gun in a holster in his waistband. (Tr. at 98.) As will be discussed later, this testimony is an unnecessary embellishment that undermines the officer's overall credibility.

### 3. The Officers' Silence in the Face of Their Alleged Suspicions

Perhaps one of the most telling and troubling aspects of the testimony that undermines the credibility of the officers' story concerns the officers' abject silence in the face of their alleged suspicions. If Zakiewicz and Velez are to be believed, both suspected from their observations of Price that Price was unlawfully carrying a gun, but neither was sure. Yet despite these suspicions, Zakiewicz and Velez, as well as their fellow officers, sat silent while Zakiewicz, either alone or accompanied by Jwayyed, exited their vehicle, left Velez and their supervisor behind, and walked toward Price and the unmitigated danger that he presented. To use Judge Gleeson's words: "Few things are more important to the safety of the public and especially of the police themselves when they stop a suspect than the presence of a firearm. A firearm on the scene is a big deal even to the most experienced officers, and the cases evidencing that reality are legion." *Mayo*, 2013 WL 4147981, at *4 (collecting cases).

Here, in the face of such a "big deal," no one asked Zakiewicz why he wanted to get out of the car, including Jwayyed who blindly followed if Velez is to be believed. No one asked, "Do you see what I see?" No one even hinted that Price might have a gun. No one suggested that they should continue watching Price, or otherwise continue their investigation. Not one of them expressed concern when Zakiewicz got out of the car. Of course, that Zakiewicz approached Price without drawing or otherwise placing his hand on his own weapon raises still further doubt regarding the veracity of his suspicions about Price.[15] And that Zakiewicz (as well as Jwayyed) was found incredible in *Mayo* on strikingly similar facts, and for strikingly similar reasons, merely underscores this Court's conclusions with regard to the officer's credibility.

---

[15] To the Court, it also serves as another indication that Zakiewicz was well aware that, under the law, the more coercive the encounter, the more reasonable suspicion the officers would need to justify a *Terry* stop.

The government attempts to distinguish *Mayo* on the ground that the officers there claimed that they actually saw a gun in Mayo's waistband.  But that is a distinction without a difference.  The need for colleagues to warn one another when one (or more) seeks to approach a potentially armed suspect does not diminish in the face of uncertain suspicions.  One could argue that the less certain an officer is as to whether the subject is armed, the greater the need to communicate the reason for approaching the suspect in the first place.  After all, here, the *only* reason for the officers to approach Price was their own alleged suspicions that he was unlawfully carrying a gun.  There were no reports of criminal or suspicious activity that prompted the officers to focus on Price.  *See United States v. Simmons*, 560 F.3d 98, 108 (2d Cir. 2009) (report of an assault in progress, the matching description, and the additional factors that supported the stop provided the officers with reason to believe that suspect was armed and dangerous); *United States v. Hill,* No. 12 CR 214, 2013 WL 3243657, at *10 (E.D.N.Y. June 26, 2013) (suspect matched the description provided by the anonymous caller).  Nor was this a case in which the officers exercised their right to inquire in the course of investigating criminal activity.  *United States v. Gori*, 230 F.3d 44, 53 (2d. Cir. 2000) ("A police officer may, in appropriate circumstances and in an appropriate manner, stop a person for purposes of investigating possibly criminal behavior, even though there is no probable cause to make an arrest.") (quoting *United States v. Bold*, 19 F.3d 99, 102 (2d Cir. 1994)).  Without question, the officers' silence here speaks volumes, just as it did before Judge Gleeson.

Not surprisingly, this Court's conclusion can easily be summarized by paraphrasing, only slightly, that of Judge Gleeson:

> No warning about a weapon was given because none of the law enforcement officers in the car knew or had reason to suspect [Price] had a weapon.  After [Price] was stopped, they discovered the gun in his [pocket].  In order to prosecute him successfully, a justification for the stop was needed, and Zakiewicz [and

Velez] alighted upon the claim that they had seen [a heavy object in Price's pants pocket that they concluded was likely a gun.] . . . They both remained strangely (and dangerously) quiet about that extremely important fact. I do not credit that testimony and as a result, I grant[ ] the motion to suppress the firearm.

*See Mayo*, 2013 WL 4147981 at *5. Indeed, the issues discussed to this point, alone or in combination, are more than sufficient to find the officers' testimony implausible. There is more, however.

### 4. Impeachment Evidence

This case presents an unusual abundance of impeachment evidence that bears directly on the credibility of the testifying officers: inconsistencies between the testimony of the two officers, as well as between Zakiewicz's own sworn testimony at the hearing and in the grand jury; favorable embellishments in an attempt to strengthen the government's narrative; and, of course, the officers' tarnished reputations for veracity. The Court has already addressed the latter, and will not belabor the point, except to say that the Court need not even resort to the officers' seriously damaged credibility to find that their testimony here lacks honesty. As to the other hallmarks of credibility, the Court addresses them briefly.

### a. Conflicting Testimony Between Zackiewicz and Velez

Zakiewicz and Velez presented significantly conflicting accounts of what occurred as Zakiewicz got out of the unmarked car. Zakiewicz testified that he asked for permission to exit the vehicle, and that Velez stopped the car "like parallel" to defendant so that Zakiewicz could exit. (Tr. 75:5.) Velez, in contrast, testified that Zakiewicz did not request permission, and was adamant in his denial, even in the face of a government stipulation indicating that Velez told the case agent otherwise. Most important, Velez's account suggests that *both* Zakiewicz and Jwayyed got out of the unmarked car at the same time. Zakiewicz says absolutely nothing about Jwayyed's presence.

The government attempts to explain this away by suggesting that Zakiewicz was not asked a question specifically about Jwayyed.  (Tr. at 297.)  That the government chose to "thread the needle" so closely in presenting its evidence is telling.  Moreover, it chose not to call Jwayyed.[16]  But the fact that another officer was, at the very least, outside of the vehicle – if not actually engaged in approaching Price – is of such factual and legal significance that 1) if true, its omission by Zakiewicz is significant, and 2) if untrue, its manufacture by Velez is all the more troubling.

### b.  Velez's Credibility

Velez is not without his own credibility issues.  Velez was combative and manifested excellent recall on key points, curiously suffering from memory lapses on simple but critical facts that would harm his case, and in response to unfavorable questions.  In addition, here, as in the case in front of Judge Dearie, Velez was similarly afflicted with an inability to recall any of the particulars leading to a substantiated claim of excessive force against him by the CCRB, as well as an IAB investigation into his false statements regarding the recovery of a gun in a woman's purse.  Indeed, Velez could not even recall if the prosecutors discussed any of these prior investigations in preparation for the instant hearing, or if he testified in the grand jury on this case, or looked at paperwork in preparation for his testimony.  Velez's repeated resort to "I don't recall" and his professed ignorance, for a second time, concerning significant events that threatened his own professional reputation, are highly suspect.

One other aspect of Velez's testimony is worth mentioning.  Notwithstanding Velez's role in driving the unmarked car, albeit at only five miles per hour, it blinks reality that Velez

---

[16] While the government need not call as witnesses all those present, the lack of testimony from an officer under the government's control who seems to have key testimony in this regard is quite puzzling.  *See, e.g., United States v. Erb*, 543 F.2d 438, 444 (2d. Cir. 1976) (failure to produce a witness under the control of a party with material evidence is open to an adverse inference against that party).  However, given the many reasons to disbelieve the officers, the Court need not resort to such an inference, even if warranted, to reach its conclusions.

saw nothing at all of Zakiewicz's encounter with Price.  At bottom, the Court finds Velez was not being forthright on this matter, particularly given his own professed suspicions that Price was armed and dangerous.

### c. Zakiewicz's Inconsistent Statements and Embellishments

Zakiewicz was confronted with many inconsistencies between his hearing testimony and that given in the grand jury. For example, while Zakiewicz told the grand jury that defendant's pocket was "sort of heavy, like it contained a heavy object" (Tr. 67:9–10), by the time of the hearing, he saw a "very heavy" (Tr. 34:13) object in defendant's pocket and then, when confronted on cross-examination with his grand jury testimony, backtracked and denied using the phrase "very heavy" (Tr. 65:25).  And Zakiewicz said nothing about this object's shape to the grand jury.

In describing why Price looked "nervous" (Tr. 70:4), Zakiewicz told the grand jury that defendant was "sort of to me looking around, looking around" (Tr. 70:7–8); at the hearing, he testified that defendant "kept on looking back over his shoulder all the time" (Tr. 33:16–17), and punctuated this testimony with a demonstration that emphasized repeated glances behind and over his shoulder.  And in recounting Price's pace, Zakiewicz testified in the grand jury:  "And we made eye contact at which point he slowed down a little bit and then he picked up his pace again." (Tr. 73:23–24.)  But at the hearing,  Zakiewicz stated that, after Price made eye contact with him, Price "slowed his pace a little bit and then he picked up his pace," adding that he resumed his travels "faster than he was initially walking."  (Tr. 24–25.)

Most notably, while Zakiewicz told the grand jury that defendant "sort of touched" his right pants pocket "at one point" (Tr. 71:25), he testified at the hearing that "[n]umerous times [Price] kept on touching that heavy object in the right pants pocket" (Tr. 35:1–2).

These differences amount to more than mere semantics given their number and significance to the issues at hand. To the Court, they were indicative of Zakiewicz's overall efforts to stretch the truth in small ways with significant cumulative impact.[17] As defendant maintained and the Court noted at oral argument, "it gets better in this version than it was in the Grand Jury." (Tr. at 343.)

## CONCLUSION

For all of the reasons stated herein, the Court declines to credit the government's witnesses. As a result, Price's motion to suppress the gun recovered from him on February 27, 2013 is granted.

The government shall notify this Court within fourteen days if it intends to pursue this prosecution.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
     February 11, 2014

_____
ROSLYNN R. MAUSKOPF
United States District Judge

---

[17] There are other small embellishments throughout the officers' testimony that attempt to further bolster the proof and nudge key suspicions more favorably toward the officers' theory of events. As an example, in an effort to paint the location as a high-crime area, both Zakiewicz and Velez provided vague information about an alleged recent shooting without any particulars or basis of knowledge. Zakiewicz goes so far as to suggest that they were on alert for retaliatory conduct, while at the same time suggesting he had no knowledge if the alleged shooting was gang-related, or among people with "ongoing problems." While presence in a high-crime area could raise an officer's suspicions of criminality, *see Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000) (law enforcement officers can take into account relevant characteristics of a location, such as whether it is a high crime area, in determining whether a *Terry* stop is warranted); *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir. 2006) (presence in high-crime area contributes to finding of reasonable suspicion), the evidence here, even if believed, does not contribute meaningfully to the proof. *See United States v. Freeman*, 735 F.3d 92, 101 & n.2 (2d Cir. 2013). Indeed here, its complete lack of specificity and foundation renders it wholly incredible.